**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-81 (TSC)** |
| **LAFONZO LEONARD IRACKS,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

In 2015, Defendant Lafonzo Iracks shot and killed another human being during the production of a music video.  He was convicted of Involuntary Manslaughter and Use of a Firearm During a Felony in Maryland and imprisoned until March 2021.  Less than ten months later, while on probation for that homicide, the defendant was arrested for possessing another loaded gun and distributable quantities of Phencyclidine (PCP) in Washington, D.C.  He is now before the Court to be sentenced for his unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), and his unlawful possession with intent to distribute PCP, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).   For reasons that follow, the United States respectfully requests that the Court sentence the defendant to a term of **60 months' imprisonment**, to be followed by three years' supervised release.  In support of its recommendation, the government respectfully submits this Memorandum in Aid of Sentencing.

### I.     FACTUAL BACKGROUND

The factual proffer to which the defendant agreed as part of his December 12, 2022, guilty plea establishes the following uncontested facts:

On January 5, 2022, at approximately 6:00 p.m., members of the Washington, D.C. Metropolitan Police Department Violent Crime Impact Team were on routine patrol, when other members of the Violent Crime Impact Team called for assistance with a traffic stop outside the

address of 1524 Isherwood Street NE, Washington, D.C.  Multiple investigators observed two individuals seated in the front seat area of a silver Chevrolet sedan bearing a Maryland license plate of 4DY6135 with smoke inside of the vehicle.  As the front passenger window of the vehicle rolled down, the investigators were able to smell the distinct odor of burnt marijuana coming from the vehicle and stopped to speak with the occupants.

Investigators approached the passenger side of the vehicle and observed a subject, later identified as Defendant Lafonzo Iracks, holding a burning marijuana rolled cigarette in his hand. Public consumption of marijuana is not legally permitted in the District of Columbia.  Investigator Jacobs observed the defendant lean forward in the front passenger seat so as to conceal the front of his body.   Based on training and experience, Investigator Jacobs recognized this behavior as a potential attempt to adjust the placement of a firearm.  At this point, Investigator Joseph asked the defendant to step out of the vehicle.

Instead of stepping out of the vehicle, the defendant moved his feet out of the vehicle and began leaning down to the ground and rubbing the burning marijuana cigarette in the snow. Investigator Jacobs recognized this as a second attempt by the defendant potentially to shield a firearm on the front of his person.  As the defendant stood up, Investigator Jacobs and Investigator Damron began conducting a protective pat down of the defendant, which he briefly resisted. During this resistance, Investigator Damron felt a heavy object in the defendant's cross-body satchel, which he was wearing across the front of his body.  Investigator Jacobs then felt what was immediately recognizable as the hard frame of a handgun in the satchel, and he voiced the predetermined code word for the presence of a firearm to the other investigators on scene.  Once the defendant was secured, Investigator Damron immediately recovered the burnt marijuana cigarette discarded by the defendant from the ground.

2

Recovered from the cross-body satchel that the defendant was wearing was a black Ruger EC9S 9mm semi-automatic handgun bearing serial number "57288S," loaded with nine (9) cartridges of 9mm ammunition.  Pursuant to a search incident to arrest, MPD officers also recovered four cologne tester tubes filled with suspected PCP from the defendant's satchel.  A search of the defendant's person revealed one additional cologne tester tube filled with suspected PCP, several empty cologne tester tubes, and one pack of Newport cigarettes.  The defendant was also in possession of a wet dropper and $421 in U.S. currency.  A wet dropper is used to assist in the distribution of PCP by allowing smaller amounts of PCP to be drawn from the larger weight. MPD officers also recovered four cell phones from the defendant.

A records check revealed that the defendant pleaded guilty to Involuntary Manslaughter and Use of a Firearm During a Felony in the Circuit Court for Prince George's County, Maryland (Case No. CT150638X) on January 8, 2016, and was sentenced to, *inter alia*, 20 years' imprisonment, all but nine (9) years suspended, with the first five (5) years mandatory without possibility of parole.  As a result of that sentence, the defendant knew at the time of this offense that he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

As part of his guilty plea, the defendant has acknowledged that the total amount of PCP recovered weighed at least 2.5 milliliters (or grams) but no more than 5 milliliters (or grams).  The defendant has also acknowledged that he possessed the narcotics with the intent to distribute them, rather than for personal use.

II.    **PROCEDURAL HISTORY**

On March 14, 2022, a federal grand jury returned a three-count indictment charging the defendant with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C.

§ 922(g)(1) (Count One); Unlawful Possession with Intent to Distribute Phencyclidine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count Two); and Using, Carrying, and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three).

On December 12, 2022, the defendant pleaded guilty pursuant to a negotiated agreement. (ECF No. 23).  Under the agreement, the defendant pleaded guilty to Counts One and Two, and the government agreed to seek dismissal of Count Three at the time of the sentencing.  (ECF No. 23 at 1–2).  The government also agreed to recommend a sentence within the bottom third of the applicable guideline range as determined by the Court.  (ECF No. 23 at 6).  The defendant reserved the right to argue at sentencing that his January 8, 2016, convictions for Involuntary Manslaughter and Use of a Firearm During a Felony do not constitute "crimes of violence" under U.S.S.G. §4B1.2, and that his base offense level should accordingly be 14 under U.S.S.G. §2K2.1(a)(6). (ECF No. 23 at 3 n.1).  The government took (and maintains) the position that the applicable base offense level is 20 under U.S.S.G. §2K2.1(a)(4)(A) because the defendant has a prior conviction for a crime of violence.  (ECF No. 23 at 3).

## III.   LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018).  The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors.  *Gall v. United States*, 552 U.S. 38, 49–50 (2007).  The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>> (i) issued by the Sentencing Commission . . .; and
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission . . . and
>> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

## IV.   SENTENCING GUIDELINES CALCULATION

### A.   "Use of a Firearm During a Felony" is a Crime of Violence Under U.S.S.G. §4B1.2.

The government concurs with Probation's determination that "the defendant committed the instant offense subsequent to sustaining one felony conviction of a crime of violence offense

(Circuit Court for Prince George's County Case No. CT150638X)."    Draft Presentence Investigation Report ("Draft PSR") ¶ 28 (ECF No. 24 at 8).   The defendant was convicted in that case of Use of a Firearm During a Felony, which is a "crime of violence" under the guidelines.

The defendant argues that Use of a Firearm During a Felony is not a crime of violence because it can encompass crimes against property and animals.   But in reading the statue so broadly, the defendant ignores how it has been interpreted by Maryland's highest court.   Under Maryland law, the statute's "use" element necessarily involves use against the person of another because, at a minimum, it "requires conduct which produces a fear of harm or force by means or display of a firearm."   *Wynn v. State*, 546 A.2d 465, 470 (Md. 1988) (attached as **Exhibit 1**).   This type of harm can be inflicted only upon a person.   Indeed, the Fourth Circuit, relying on *Wynn*, concluded that the statute "prohibits precisely the conduct that qualifies a crime as violent under [the guidelines]," because "it is tautological that the Maryland offense 'has as an element the use . . . or threatened use of physical force against the person of another.'"   *United States v. Goodman*, No. 955240, 1996 WL 241834, at *1 (4th Cir. May 10, 1996) (attached as **Exhibit 2**). As discussed below, at least one judge of this Court has recently relied on *Wynn* and *Goodman* to hold that a Maryland Use of a Firearm During a Felony conviction is a "crime of violence."

### 1.  Background

On November 16, 2015, the defendant pleaded guilty in the Circuit Court for Prince George's County, Maryland, to one count of common law Involuntary Manslaughter and one count of Use of a Firearm During a Felony, in violation of Maryland Criminal Code § 4-204(b) (formerly codified as Maryland Code art. 27, § 36B(d)), for the April 1, 2015, shooting death of Keaway Ivy. The Draft PSR does not contain details of the offense, but media accounts indicate that the defendant shot Ivy in the chest during the production of a music video.   *See, e.g., Arrest Made in*

*Shooting of D.C. Man Found Dead in Seat Pleasant*, Wash. Post (Apr. 3, 2015), https://www.washingtonpost.com/local/crime/arrest-made-in-shooting-of-man-found-dead-in-seat-pleasant/2015/04/03/34d3fae2-da13-11e4-8103-fa84725dbf9d_story.html ("Police said they arrested Lafonzo Leonard Iracks, 21, in connection with the fatal shooting of Keaway Lafonz Ivy, 21.  Iracks and Ivy were working on a [music] video around 10:30 p.m. in the 500 block of 62nd place, near the District border, when Iracks fired his gun, striking Ivy in the chest, police said.").

On January 8, 2016, the defendant was sentenced to 10 years' incarceration with 1 year suspended on the Involuntary Manslaughter count, 20 years' incarceration with 11 years suspended on the Use of a Firearm During a Felony count, and five years' probation.  On March 7, 2021, the defendant was released from custody.

**2.  Legal Standard**

***Maryland Criminal Code § 4-204(b)) ("Use of a Firearm During a Felony")***

Under Maryland Criminal Code § 4-204(b) (formerly codified as Maryland Code art. 27, § 36B(d)), "[a] person may not use a firearm in the commission of a crime of violence, as defined in § 5-101 of the Public Safety Article, or any felony, whether the firearm is operable or inoperable at the time of the crime."

***"Crime of Violence" Under the Sentencing Guidelines***

U.S.S.G. §4B1.2 provides:

(a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

To determine whether a conviction counts as a "crime of violence" under the guidelines, courts use the "categorical approach." *Borden v. United States*, 141 S. Ct. 1817, 1822 (2021); *see also United States v. Carr*, 946 F.3d 598, 601 (D.C. Cir. 2020) (citing *United States v. Brown¸* 892 F.3d 385, 402 (D.C. Cir. 2018), and *Begay v. United States*, 553 U.S. 137, 141 (2008)); *In re Sealed Case*, 548 F.3d 1085, 1089 (D.C. Cir. 2008) (explaining that the guidelines crime of violence analysis is the same as in Armed Career Criminal Act cases). Under the categorical approach, "the facts of a given case are irrelevant. The focus is instead on whether the elements of the statute of conviction meet the federal standard. Here, that means asking whether a state offense necessarily involves the defendant's 'use, attempted use, or threatened use of physical force against the person of another.'" *Borden*, 141 S. Ct. at 1822.

### 3. Discussion

Although the government agrees that Maryland Involuntary Manslaughter is not a crime of violence under the guidelines, Use of a Firearm During a Felony is a separate offense. *See Sequiera v. State*, 248 A.3d 1151, 1164 (Md. Ct. Spec. App. 2021) ("[T]he statutory language makes clear that the use of a firearm offense is separate from the predicate offense." (citing *Ford v. State*, 337 A.2d 81, 84–85 (Md. 1975))). Courts have held that this offense is a crime of violence because—contrary to the defendant's argument that it encompasses crimes against animals and property—the Maryland Court of Appeals' holding in *Wynn* makes clear that the offense necessarily entails the actual, attempted, or threatened use of physical force against a person.

In *Wynn v. State*, Wynn was convicted of use of a handgun in the commission of a crime of violence[1] for possessing a handgun during the commission of housebreaking. *See* 546 A.2d at

---

[1] In this Memorandum, the government refers to the "Use of a Firearm During a Felony" offense with the nomenclature used by each court in its respective opinion. "Use of a Firearm During a Felony," "use of a handgun in the commission of a crime of violence," "use of a handgun in the

466.  The version of the statute in effect at the time made it a criminal offense to "use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence."  *Id.* at 467 (quoting Md. Code. art. 27, § 36B(d)).  Wynn appealed to the Maryland Court of Appeals (now the Maryland Supreme Court), arguing that the state was required to prove that "he utilized the gun, beyond mere possession, in order to convict him of use of a handgun in the commission of a crime of violence."  *Id.* at 468.

As the court observed, "[t]he statute does not define 'use.'"  *Id.* at 467.  To define the element of "use," the court looked to the statute's legislative history.  The court "note[d] that the legislature specifically distinguished between the *wearing, carrying, and transporting* of handguns and the *use* of handguns in criminal activity."  *Id.* at 469 (emphasis in original).  It explained that

> the legislature emphasized that the increase in the number of persons killed or
> injured by handguns was directly related to the carrying of handguns by persons
> inclined to use them in criminal activity.  This comment clearly indicates that the
> legislature considered the use of a handgun to be something more than mere illegal
> possession of a handgun and that the legislature contemplated *use* of a handgun in
> an active as opposed to a passive manner.  Death and injury do not arise from a
> handgun which remains holstered.

*Id.* (emphasis in original).  Based on the legislative history and the fact that the legislature made

---

commission of a crime," and "use of a handgun in the commission of a felony" all refer to the same criminal offense.  The current statute, codified as Maryland Criminal Law Code § 4-204(b), is captioned "Use of firearm in commission of crime."  Before 2011, the statute prohibited the "use" of a "an antique firearm capable of being concealed on the person or any handgun . . . in the commission of a crime of violence or any felony."  In 2011, the statute was amended to replace the phrase "an antique firearm capable of being concealed on the person or any handgun" with the word "firearm," which the statute now defines to include "an antique firearm, handgun, rifle, shotgun, short-barreled rifle, short-barreled shotgun, starter gun, or any other firearm, whether loaded or unloaded."  Md. Crim. Law Code § 4-204(a)(2).  Before 2002, the statute was codified as Maryland Code art. 27, § 36B(d), which was captioned "Unlawful use of handgun or antique firearm in commission of crime," and made it unlawful to "use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence."  Although the statute has been restyled over the years, its essential elements have remained the same.

the carrying and wearing of a handgun and the *use* of a handgun separate offenses, the court "agree[d] with Wynn that in the context of the entire statute, the term 'use' connotes something more than bare possession of a handgun in the commission of a crime of violence." *Id.* at 470.

The court also endorsed the Supreme Court of California's interpretation of an analogous statute in *People v. Chambers*, 498 P.2d 1024 (1972). In *Chambers*, the California Supreme Court held that "[a]lthough the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of . . . [a] felon[y]." *Wynn*, 546 A.2d at 470 (quoting *Chambers*, 498 P.2d at 1027–28). The fear of harm or force is plainly a wrong inflicted upon the person of another.

And as the Maryland court recognized, the "paramount purpose of the General Assembly in enacting [the statute] was to reduce the especially high potential for death or serious injury that arises when a handgun, as distinguished from some other weapon, is used in a crime of violence." *Id.* (quoting *York v. State*, 467 A.2d 552, 555–56 (Md. 1983)). Because "there was no evidence that Wynn in any way actively used a gun in the housebreaking," the court reversed his conviction. *Id.* at 471. It is thus clear from the court's opinion that, as a matter of Maryland common law, the element of "use" in what is now the "Use of a Firearm During a Felony" offense requires the actual or threatened use of a firearm against the person of another.

In *United States v. Goodman*, the Fourth Circuit considered whether the district court had correctly concluded that Goodman's 1978 Maryland conviction for use of a handgun in the commission of a crime is a "crime of violence" for the purpose of applying the career offender guideline. 1996 WL 241834, at *1. The court held that the offense is indeed a crime of violence under the guidelines, focusing on the fact that the statute proscribes the "*use*" of a handgun. *Id.*

(emphasis in original).  Relying on *Wynn*, the court explained that "the Maryland Court of Appeals has stated that 'use of a firearm connotes something more than a bare potential for use'; 'while there need not be conduct which actually produces harm,' the Maryland statute 'requires conduct which produces a fear of harm or force by means or display of a firearm.'"  *Id.* (quoting *Wynn*, 546 A.2d at 470 (quoting in turn *People v. Chambers*, 498 P.2d at 1027–28)).  The court thus concluded that "[t]he Maryland statute prohibits precisely the conduct that qualifies a crime as violent under [the guidelines]," reasoning:

> From the decision in *Wynn* that "use" requires conduct that threatens harm or the use of force, it is tautological that the Maryland offense "has as an element the use . . . or threatened use of physical force against the person of another."  Common sense dictates, moreover, that the crime inherently "involves conduct that presents a serious potential risk of physical injury to another."

*Id.*  Accordingly, the court held Goodman's Maryland conviction for use of a handgun in the commission of a crime was a "crime of violence" under the guidelines and affirmed the district court's enhancement of his sentence.

More recently, in *United States v. Keith McGill*, No. 02-CR-45 (RCL), Judge Lamberth relied on *Goodman* and *Wynn* to conclude that what is now the "Use of a Firearm During a Felony" offense is a crime of violence under the guidelines.  In 2020, the D.C. Circuit remanded *McGill* for resentencing so that the district court could, *inter alia*, explain its decision to apply the career offender guideline.  *See* Gov't Br. at 11–12, *United States v. McGill*, No. 21-3058 (D.C. Cir. May 26, 2022) (attached as **Exhibit 3**).  An amended PSR was prepared in 2021, which stated that McGill qualified for the career offender guideline based on his (1) 1989 Maryland conviction for use of a handgun in the commission of a felony and assault with intent to rob and (2) 1990 Maryland conviction for robbery with a deadly weapon.  *See id.* at 23–24.  The government did not seek application of the career offender guideline "in an excess of caution."  *See id.* at 24.  The

11

government asserted that McGill's 1990 Maryland conviction for robbery with a deadly weapon qualified as a crime of violence. *See id.* But it treated McGill's 1989 Maryland convictions for use of a handgun in the commission of a felony and assault with intent to rob as one conviction for career offender purposes, and it recognized that there was conflicting authority regarding whether Maryland common law assault and robbery are crimes of violence. *See id.* at 24, 28 & n.10. The district court nevertheless applied the career offender guideline. *See id.* at 28. The court did not reach the question of whether Maryland assault with intent to rob is a crime of violence because, relying on *Wynn* and *Goodman*, it instead concluded that McGill's 1989 Maryland conviction for use of a handgun during the commission of a felony was a crime of violence. *See id.* at 28–29.

On appeal, McGill acknowledged that he might have been "technically eligible" for the career offender guideline, but he argued that the district court abused its discretion in applying the guideline because it significantly overrepresented his criminal conduct and likelihood of recidivism. *See id.* at 45. The government argued that the district court properly based its application of the career offender guideline on McGill's 1989 Maryland conviction for use of a handgun in the commission of a felony and his 1990 Maryland conviction for robbery with a deadly weapon, and McGill did not argue otherwise. *See id.* at 47.

On October 28, 2022, the D.C. Circuit affirmed McGill's sentences. *See* Judgment, *United States v. McGill*, No. 21-3058 (D.C. Cir. Oct. 28, 2022) (per curiam) (attached as **Exhibit 4**). The court found no error in the district court's application of the career offender guidelines but noted McGill's concession that the guideline applied to him. *See id.* at 2

As at least one judge of this Court and the Fourth Circuit have recognized, under Maryland law, the *use* element in the Maryland Use of a Firearm During a Felony offense "requires conduct which produces a fear of harm or force by means or display of a firearm." *Goodman*, 1996 WL

241834, at *1 (quoting *Wynn*, 546 A.2d at 470).   This is a wrong perpetrated against human victims.  The offense thus necessarily "has as an element the use, attempted use, or threatened use of physical force against the person of another," and so qualifies as a crime of violence under §4B1.2(a)(1).

**B.  The Defendant's Total Offense Level is 21.**

The government concurs with Probation's calculation of the total offense level as 21.  (ECF No. 24 at 8–9).  The guidelines for Counts One and Two group under U.S.S.G. §3D1.2(c) because one of the counts is treated as a specific offense characteristic to the other.  The guideline applicable to Count One (§2K2.1) produces the highest offense level and so is the offense level applicable to the group under U.S.S.G. §3D1.3(a).

The base offense level for Count One is 20 under U.S.S.G. §2K2.1(a)(4)(A) because, as discussed below, the defendant committed this offense after sustaining a conviction for a crime of violence in the Circuit Court for Prince George's County, Maryland (Case No. CT150638X).  Four (4) points are added under U.S.S.G. 2K2.1(b)(6)(B) because the defendant possessed a firearm in connection with another felony offense, that is, Possession with Intent to Distribute PCP.  Finally, three (3) points are deducted for acceptance of responsibility under U.S.S.G. §§3E1.1(a), (b).

The total offense level is thus 21.

**C.  The Defendant's Criminal History Category is IV, and His Guideline Range Is Thus 57 to 71 Months' Imprisonment.**

The government also concurs with Probation's assessment of the Defendant's criminal history as set forth in the Draft PSR at 8–14 (ECF No. 24 at 9–15).  As reflected in the Draft PSR and in the table on the next page, the total criminal history score is nine (9), establishing a criminal history category of IV.  With a criminal history category of IV and a total offense level of 21, the defendant's guideline range is 57 to 71 months' imprisonment.

| Conviction | Jurisdiction & Docket No. | Date & Sentence | U.S.S.G. Points |
|---|---|---|---|
| Involuntary Manslaughter + Use Handgun/Crime Of Viol/Comm | CT150638X (Circuit Court for Prince George's County, Maryland) | 1/8/2016 10 years' imprisonment, all but 9 years suspended 20 years' imprisonment, all but 9 years suspended, with first 5 years mandatory without possibility of parole, to run concurrently with Involuntary Manslaughter sentence Probation commenced on 3/7/2021 for at least 5 years; PSA reports defendant on probation until 12/31/2099 | 3 points (§ 4A1.1(a)) 2 points for committing offense while on supervision (§ 4A1.1(d)) |
| Violation of CPO + Attempted Threats to Do Bodily Harm - Misd | 2012 DVM 002706 (D.C. Superior Court) | 8/12/2014 180 days imprisonment 180 days imprisonment | 2 points (§ 4A1.1(b)) |
| Attempted Threats to Do Bodily Harm - Misd | 2012 DVM 001681 (D.C. Superior Court) | 1/11/2013 180 days imprisonment | 2 points (§ 4A1.1(b)) |
| | | **Total:** | **9 points (Category IV)** |

## V.     THE GOVERNMENT'S SENTENCING RECOMMENDATION

As stated above, the government respectfully requests that the Court sentence the defendant to a term of **60 months' imprisonment**, to be followed by three years' supervised release.

### A. Nature and Circumstances of the Offense

The nature and circumstances of this offense are serious and warrant a significant sentence. As a threshold matter, the defendant's possession of a loaded handgun was an inherently dangerous

14

act that placed the community at risk.  *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").  While this case does not involve the defendant's use of the recovered firearm, people carry guns because they intend to use them.  And the use of violent crimes committed with guns in the District continues to rise:  between March 15, 2020, and March 15, 2023, violent crimes committed with a gun went up by 1,848 compared to the previous three years.  *Crime Cards*, Metro. Police Dep't,  https://crimecards.dc.gov/all:violent%20crimes/ with%20a%20gun/3:years/citywide:heat (last visited Mar. 15, 2023).  Similarly, the homicide rate has skyrocketed, with the past two years having the highest homicide rates since 2003:  In 2022, there were 203 homicides, and in 2021, 226 homicides.  *District Crime Data at a Glance: 2023 Year-to-Date Crime Comparison*, Metro. Police Dep't,  https://mpdc.dc.gov/page/district-crime-data-glance (last visited Mar. 15, 2023).  There have already been at least 45 homicides in 2023, a 15% increase from this time last year.  *Id.*  By comparison, in 2012, there were 88 homicides.  *Id.* While the defendant's crimes did not result in any direct violence against another, unlawful possession can lead to dangerous consequences, thereby underscoring the need to take such crimes seriously.  This is especially true where, as here, the defendant has previously killed another person using a firearm.

The fact that defendant has admitted to possessing the gun while intending to distribute PCP is especially alarming.  Because drug trafficking is unlawful, there is a heightened risk that an individual will use a gun to resolve a dispute or to defend his drug supply or earnings.  Guns

thus pose an even greater danger to the community when in the hands of those dealing drugs.  *See, e.g.*, *Muscarello v. United States*, 524 U.S. 125, 132 (1998) (recognizing the "dangerous combination" of "drugs and guns") (quoting *Smith v. United States*, 508 U.S. 223, 240 (1993)). Moreover, PCP is a psychologically addictive and exceptionally dangerous drug.  According to the Mount Sinai Medical Center, the effects of taking PCP can range from "numbness throughout your body and loss of coordination" for low doses to "hear[ing] voices that are not there" and engaging in "aggressive and violent" behavior for higher doses.  *Substance use - phencyclidine (PCP)*, Mount Sinai,  https://www.mountsinai.org/health-library/special-topic/substance-use-phencyclidine-pcp (last visited Mar. 14, 2023).  In Washington, D.C., PCP is commonly consumed by means of a cigarette dipped into a tube of PCP, which is referred to as a "dipper."  *Public Vice and Drug Trends: Understanding the Risks and Dangers of Phencyclidine (PCP)*, Metro. Police Dep't (March 2011), *available at* https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/PCP.pdf (attached as **Exhibit 5**).  The defendant's possession of cologne tubes is consistent with this method of distribution, which is particularly dangerous for PCP users:

> There are other dangers to consider in regards to the potency and purity of any dose of PCP.  If a cigarette is dipped into a PCP solution, the dose can be highly variable. Fry, the street name for marijuana or tobacco mixed with phencyclidine, may also be mixed with embalming fluid.  This contains formaldehyde, ethanol, and methanol, and it can also cause hallucinations.  The fluid is added to enable a cigarette or joint to burn more slowly, possibly leading to a longer high. Consuming embalming fluid can cause damage to body tissues, including the lungs and brain, inflammation, nose and throat sores, and cancer.

> Concentrations of PCP and its byproducts vary considerably when it is sold on the street, as the drug is difficult to synthesize. Many illicit samples contain PCC, its precursor, which is highly toxic and releases poisonous cyanide. The precursors of PCP can cause more devastating effects than the drug itself.

*Effects and Dangers of PCP Use*, Am. Addiction Ctrs., https://americanaddictioncenters.org/pcp-abuse/effects-and-dangers (last updated Sept. 9, 2022).

Most concerning, however, is the fact that, when the defendant committed the instant offenses, he had already served nearly six years in prison for taking a human life with a gun and was only ten months into his term of probation for that homicide.  This is what Chief Judge Howell recently described as "the trifecta of circumstances" in assessing dangerousness – "unlawful possession of a loaded firearm, criminal history of a violent crime conviction involving a firearm, and instant offense conduct occurring while on supervision or probation." *United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *11 (D.D.C. Feb. 6, 2023).

In view of the nature and circumstances of this offense, a sentence of **60 months' imprisonment**—a substantial sentence within the applicable guideline range—is warranted.

### B.  The History and Characteristics of the Defendant

Although the defendant has accepted responsibility for his actions in this case, his unlawful possession of a firearm and distributable quantities of PCP is particularly troubling considering his criminal history.  As detailed above, the defendant's criminal history category is IV.  The largest contributor to the defendant's criminal history score is his 2016 Maryland convictions for Involuntary Manslaughter and Use of a Firearm During a Felony, for which the defendant was on probation at the time of his offense following an almost six-year prison term, as discussed above. The defendant also has adult convictions in two 2012 D.C. Superior Court cases for Attempted Threats and Violation of a CPO.  In both of those cases, the defendant's probation was revoked to incarceration.  The nature of a CPO violation, coupled with the defendant's violation of probation in those cases and in his 2016 Maryland case, demonstrate the defendant's ongoing disrespect of the law.  Moreover, the defendant's criminal history score may underrepresent his danger, as it does not take into account his juvenile adjudications.

## C.  The Need for the Sentenced Imposed

The defendant spent nearly six years in prison for killing another person with a firearm and within ten months of his release again possessed a loaded gun while trafficking PCP.  A significant term of incarceration is necessary to incapacitate the defendant and protect the community from his crimes.  A substantial prison term is also necessary to deter the defendant from unlawfully possessing firearms in the future.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully recommends that the Court sentence Defendant Lafonzo Iracks to a term of **60 months' imprisonment** to be followed by three years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

Dated: March 15, 2023            By:    */s/ Paul V. Courtney*
                                          Paul V. Courtney
                                          D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
                                          Assistant United States Attorney
                                          United States Attorney's Office
                                          for the District of Columbia
                                          601 D Street NW
                                          Washington, D.C. 20530
                                          (202) 252-1719
                                          paul.courtney@usdoj.gov